Filed 11/16/17; Certified for Publication 12/7/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OPTIONAL CAPITAL, INC., | B275274 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC474472) |
| v. | |
| AKIN GUMP STRAUSS, HAUER & FELD LLP et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of Los
Angeles County, Teresa Sanchez-Gordon, Judge. Affirmed.

Rogari Law Corporation, Ralph Rogari; Law Offices of
Mary Lee and Mary Lee for Plaintiff and Appellant.

McDermott, Will & Emery, Gordon A. Greenberg and Charles Edward Weir for Defendant and Respondent Akin Gump, Strauss, Hauer & Feld LLP.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Kenneth C. Feldman and Larissa G. Nefulda for Defendants and Respondents Parker Shumaker Mills LLP, David Parker and William Mills.

————————

Optional Capital, Inc. (Optional or Plaintiff) sued various entities and individuals, including DAS Corporation (DAS) and its counsel—Akin Gump Straus Hauer & Feld LLP (Akin) and Parker Shumaker Mills LLP, David Parker and William Mills (collectively, Parker) (collectively with Akin, Defendants)—for conversion and fraudulent transfer. Plaintiff sought to recover from Defendants on theories of vicarious liability (conspiracy and aiding and abetting).

In response, Defendants, pursuant to section 425.16 of the Code of Civil Procedure,[1] filed special motions to strike all claims asserted against them—so-called anti-SLAPP motions.[2] In their motions, Defendants argued that their respective representations of DAS were protected petitioning activity under the anti-SLAPP statute and that Plaintiff

_____

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)

2

could not show a probability of prevailing on any of its claims due, among other things, to the litigation privilege. The trial court eventually granted Defendants' motions.

On appeal, Plaintiff argues that Defendants' alleged misconduct is not protected activity under the anti-SLAPP statute and, even if it were, Plaintiff presented the trial court with sufficient evidence to establish a probability of prevailing on the merits of its claims. In addition, Plaintiff argues that our decision in a prior appeal involving DAS's anti-SLAPP motion (*Optional v. DAS Corp.* (2014) 222 Cal.App.4th 1388 (*Optional I*)) is "the law of the case" and, as a result, Defendants' reliance on the litigation privilege is unavailing. We disagree with Plaintiff on each point and, accordingly, affirm.

## BACKGROUND[3]

Plaintiff is a Korean venture capital firm, whose investors included DAS. (*Optional I, supra,* 222 Cal.App.4th at pp. 1392–1393.) In 2001, according to Plaintiff, DAS and certain individuals (the Kim parties) conspired to and did

---

[3] As we noted in our earlier opinion, "[t]his case involves an extremely tangled thicket of legal proceedings in both state and federal court, as well as Switzerland." (*Optional I, supra,* 222 Cal.App.4th at p. 1392.) Since we have discussed that tangled thicket in some detail previously, (see *id.* at pp. 1392–1395), and since the parties are familiar with the various proceedings, we will set forth only as much background as is relevant to the disposition of this appeal.

3

take control of Optional, converting more than $35 million of Optional's funds.  (*Ibid*.)  The Kim parties created a California corporation, Alexandria Investments, Inc. (Alexandria), and then transferred the money misappropriated from Plaintiff into bank accounts in the name of Alexandria at United Commercial Bank in Rowland Heights, California.  (*Ibid*.)

## I.    The underlying lawsuits

### A.    THE STATE COURT ACTION

In May 2003, DAS sued the Kim parties and others in California state court (the state court action), alleging, among other things, fraud, breach of contract, and breach of fiduciary duty.  (*Optional I*, *supra*, 222 Cal.App.4th at pp. 1392–1393.)  As part of the state court action, DAS alleged that the Kim parties had transferred the funds looted from Plaintiff into the United States.  Later in 2003, after DAS had inaugurated the state court action, Alexandria transferred more than $15 million of Plaintiff's converted money to a bank account at Credit Suisse in Geneva, Switzerland.  (*Ibid*.)

### B.    THE FEDERAL FORFEITURE ACTION

Beginning in 2004, the United States Government, based on the conduct of the Kim parties in running Optional, commenced a series of forfeiture proceedings in California federal district court that were later consolidated into one proceeding (the federal forfeiture action).  (*Optional I*, *supra*, 222 Cal.App.4th at pp. 1393–1394 & fn. 3.)  "At the request of the United States government, the Swiss government

4

froze the Credit Suisse account . . . . Both Optional and DAS were claimants in the forfeiture action arising out of the Kim parties' looting of Optional, and both Optional and DAS filed claims to the various assets, including the monies in the Credit Suisse account." (*Id*. at p. 1394.) Beginning in 2005, Parker represented DAS in the federal forfeiture action.

In March 2007, the United States District Court granted the Kim parties' summary judgment motion against the United States government in the federal forfeiture action, a decision the Ninth Circuit affirmed in 2008, thereby extinguishing the United States government's forfeiture claim and the government freeze on the Credit Suisse account. (*Optional I*, *supra*, 222 Cal.App.4th at p. 1394.)

In October 2009, the federal district court granted summary judgment in favor of the Kim parties on all remaining properties, resulting in the dismissal of DAS's and Plaintiff's claims. Both DAS and Plaintiff appealed.

C. PLAINTIFF'S FEDERAL COURT ACTION

In 2004, Plaintiff filed a lawsuit in federal district court in California against the Kim parties and Alexandria seeking damages for fraud and conversion based on the looting of Optional (Plaintiff's federal court action). (*Optional I*, *supra*, 222 Cal.App.4th at p. 1394.)

In 2008, the jury returned a verdict in Plaintiff's federal court action, finding that the Kim parties and Alexandria converted approximately $15.5 million from Optional. (*Optional I*, *supra*, 222 Cal.App.4th at p. 1394.)

The federal district court, however, subsequently vacated the jury award, extinguishing Plaintiff's judgment lien. (*Ibid.*)

D. DAS'S CRIMINAL ACTION IN SWITZERLAND

In April 2007, after the Kim parties won their summary judgment motion against the United States government in the federal forfeiture action, DAS instituted criminal proceedings in Switzerland against Alexandria, thereby obtaining a second freeze on the Credit Suisse funds (DAS Freeze). (*Optional I*, *supra*, 222 Cal.App.4th at p. 1394.) "Although it was aware of the DAS Freeze on the funds, Optional did not take any action on its own in Switzerland to freeze the funds." (*Ibid.*)

E. A CONFLUENCE OF EVENTS IN 2010-2011

During the period 2010-2011, a number of events occurred in rapid succession in the underlying proceedings that would give rise to Plaintiff's claims below.

In November 2010, the parties to the state court action, through private mediation, reached a confidential settlement. (*Optional I*, *supra*, 222 Cal.App.4th at p. 1395.) At the time of the settlement, Akin represented DAS.

In December 2010, funds became available to fund the settlement in the state court action. Shortly after the parties to the state court action had settled their dispute, the Swiss investigating magistrate was informed of the settlement. (*Optional I*, *supra*, 222 Cal.App.4th at p. 1395.) At a hearing in February 2011, "with DAS and Alexandria present, the Swiss government lifted the DAS Freeze and

6

the funds on deposit at Credit Suisse were released to DAS. Optional did not participate in these proceedings." (*Ibid*.)

Also, in December 2010, the Ninth Circuit reversed and reinstated both DAS's and Plaintiff's claims in the federal forfeiture action. One month later, in January 2011, the Ninth Circuit reinstated Plaintiff's recovery on its conversion claim. (*Optional I*, *supra*, 222 Cal.App.4th at p. 1395.)

In May 2011, with its restored judgment against the Kim parties, Plaintiff sought a contempt order against DAS and its counsel (attorneys from both Parker and Akin), arguing, among other things, that the settlement in the state court action was "designed to thwart [the federal district court's] jurisdiction and deprive Optional of its opportunity to pursue its claims" on the funds in the Credit Suisse account. Plaintiff asked the federal district court to order the return of the funds from Credit Suisse account.

In June 2011, the federal district court denied Plaintiff's requests. While the district court recognized that DAS's conduct had, in effect, "bypassed [its] *in rem* jurisdiction over the Credit Suisse accounts," neither DAS nor its counsel violated any court order. In fact, "DAS obtained the relief it sought from a legitimate authority that had both jurisdiction and actual control over the [Credit Suisse] accounts."

In November 2011, the district court, over Plaintiff's objection, dismissed DAS from the federal forfeiture action.

7

## II.  Plaintiffs' claims against Defendants

On December 1, 2011, Plaintiff filed its initial complaint in the action below.  Plaintiff alleged that DAS, Defendants, and various other individuals and entities, including the United States government, "agreed on a common plan . . . to fraudulently transfer 13 million dollars from the Credit Suisse Bank account to DAS and thereby hinder, delay or defraud OPTIONAL in recovering that property."  Although Plaintiff did not provide any details about the formation and operation of the alleged conspiracy, it alleged that the DAS Freeze was a result of the conspiracy and that Parker had made misleading representations to the federal district court and to the Ninth Circuit.

Plaintiff's initial complaint spurred a number of anti-SLAPP motions from various defendants.  DAS filed the first of these motions on March 27, 2012.  On April 4, 2012, the same day that Akin filed its anti-SLAPP motion, Plaintiff voluntarily dismissed Akin from the case.  On April 12, 2012, Plaintiff and Parker stipulated that Parker could defer filing its anti-SLAPP motion until after an appeal was decided on the then-pending anti-SLAPP motions.

The trial court granted DAS's anti-SLAPP motion and Plaintiff appealed.  (*Optional I, supra,* 222 Cal.App.4th at pp. 1396–1397.)  In an opinion dated January 15, 2014, we reversed, holding that "DAS's conduct in obtaining money from Alexandria's Credit Suisse account did not constitute protected activity under section 425.16, Optional has established a reasonable probability of prevailing on the

8

merits because it can trace the funds the Kim parties wrongfully took from Optional to the funds in Alexandria's account, and the litigation privilege does not bar Optional's claims." (*Id*. at p. 1397.)

In March 2014, following our decision in *Optional I, supra*, 222 Cal.App.4th 1388, Plaintiff filed its first amended complaint (FAC), the operative complaint for purposes of this appeal. The FAC, besides adding a third cause of action for violation of Penal Code section 496, added little in the way of detail with respect to the alleged conspiracy. The only significant additional factual averment with regard to the conspiracy was that the "agreement originated with United States attorneys in the Justice Department" and "had the approval of the president of the United States," with the goal being a "new trade agreement between the United States and South Korea."

## III.   Defendants' anti-SLAPP motions

On May 28, 2014, Parker filed its anti-SLAPP motion. In its motion, Parker stressed that it was counsel of record for DAS in the federal forfeiture action and, as a result, it had nothing to do with the settlement in the state court action or with the Swiss proceedings connected with the DAS Freeze or with the transfer of funds from the Credit Suisse account to DAS. Moreover, as DAS's counsel in the federal forfeiture action, Parker argued that its actions were protected activity under the anti-SLAPP statute and that Plaintiff could not show a probability of prevailing on any of its claims due to, among other things, the litigation

9

privilege. Parker's motion was supported by, inter alia, a declaration from one of the Parker attorneys who represented DAS in the federal forfeiture action.

On August 5, 2014, Akin, which Plaintiffs had brought back into the lawsuit, filed a second anti-SLAPP motion. Akin argued that Plaintiff's claims against it in the FAC were premised on Akin's provision of legal services to DAS in the state court action including the negotiated settlement of that action, actions which were protected by the anti-SLAPP statute and the litigation privilege, among other things. Although Akin's motion was not supported by a declaration from any of its attorneys who represented DAS in the state court action, Akin submitted court records from that case establishing that it was counsel of record for DAS in the state court action at or around the time of the settlement.

Parker and Akin joined in each other's motions.

## IV. Plaintiffs' oppositions

Plaintiff opposed both motions. In opposition to Defendants' motions, Plaintiff argued that, based on our holding in *Optional I, supra*, 222 Cal.App.4th 1388, Defendants' respective representations of DAS were not protected petitioning activity under the anti-SLAPP statute. Plaintiff, in other words, argued that Defendants were vicariously liable for DAS's misconduct.

Consistent with its law of the case argument, Plaintiff relied on evidence that concerned its claims against DAS. For example, in the lone declaration filed in support of Plaintiff's oppositions, the evidentiary focus is on

10

establishing Plaintiff's right to the funds in the Credit Suisse account, not on identifying Defendants' conduct in support of the alleged conspiracy.  To the extent that Plaintiff identified any specific acts of alleged misconduct by the Defendants, it was limited to certain purported omissions and misrepresentations by Defendants in the federal forfeiture action.  More specifically, Plaintiff submitted an order from the district court in the federal forfeiture action denying Plaintiff's contempt motion against DAS and its attorneys.  Although the district court denied Plaintiff's motion, it expressed some dismay with respect to the conduct of Defendants, especially in regard to their arguably belated disclosure of the state court settlement and the transfer of funds from the Credit Suisse account to DAS:  "While a finding of contempt cannot be supported . . . , the events described above and counsel's explanations . . . give the Court some pause as to counsel's judgment and credibility.  Specifically, the Court views with some skepticism [Parker's] disclaiming any meaningful knowledge of the settlement [citations] and [Akin's] suggestion that the removal of 14 billion won from the Credit Suisse accounts is of no consequence to this Court's *in rem* jurisdiction . . . . [¶] . . . [T]hat the DAS-Kim settlement contains a confidentiality clause is not an adequate explanation for any counsel's failure to disclose the existence of the settlement. . . .  The Court should not have to ferret out information so crucial to case management . . . .  [¶] . . . Most attorneys practicing before

11

this Court are forthright and assist the Court in the objective we all strive for—the speedy and efficient provision of justice  [Citation.]  The conduct of counsel for DAS and the Kims, described herein, was, regrettably, lacking such cooperation."

On January 27, 2015, the trial court granted both of Defendants' motions.  However, based on certain comments made during the hearing on the motions, the judge was subsequently disqualified.  As a result, the ruling in favor of the Defendants was vacated without prejudice to the parties re-litigating the motions.

In February 2016, after the case had been reassigned to a different judge, the Defendants rescheduled their motions.  The Defendants also sought leave to file supplemental briefs addressing new case law.  The new judge granted Defendants' request and granted Plaintiff the opportunity to fully brief its opposition to the motions to address the new authorities relied upon by Defendants.

In its supplemental oppositions, Plaintiff continued to argue, based on our prior holding, that because DAS's conduct was not protected under the anti-SLAPP statute neither was Defendants' conduct.  And, as before, Plaintiff's evidence was devoted primarily to reproving its successful conversion claim in the federal court action and thereby its right to the funds in the Credit Suisse account.  However, Plaintiff also augmented its prior evidentiary submissions about Defendants' purported failure to timely disclose to the district court overseeing the federal forfeiture action the

12

state court settlement and resulting transfer of funds to DAS.  For example, in addition to the district court's order denying the  contempt motions, Plaintiff included excerpts from a transcript of a hearing before the district court at which attorneys for both Defendants appeared, various orders by the district court taking issue with "DAS's silence" with respect to the status of the Credit Suisse account, and responsive filings by DAS.

In April 2016, the trial court granted Defendants' motion, observing to Plaintiff, "You might allege all these things [conspiracy, etc.], but where is the evidence?" Plaintiff timely appealed from both orders.

## DISCUSSION

**I.    *Optional I*, *supra*, 222 Cal.App.4th 1388 is not the "law of the case" for purposes of this appeal**

Plaintiff contends on appeal, as it did below, that *Optional I*, *supra*, 222 Cal.App.4th 1388 is the "law of the case."  Consequently, as a preliminary matter, we need to address what effect, if any, our prior decision in *Optional I* has on the outcome of this appeal.

" 'The law of the case doctrine states that when, in deciding an appeal, an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal." ' " (*Quackenbush v. Superior Court* (2000) 79 Cal.App.4th 867, 874.)  The doctrine applies to a rule of law necessarily decided in an

appellate decision and determines " 'the rights of the *same parties* in any subsequent retrial or appeal in the same case.' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301, italics added; *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491 [doctrine applies to "same parties"].) "The 'law of the case' doctrine . . . precludes a party from obtaining appellate review of the *same issue* more than once in a single action." (*Katz v. Los Gatos–Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62, italics added; *People v. Boyer* (2006) 38 Cal.4th 412, 441 [doctrine applies to " 'an already decided issue in the same case' "].)

The law of the case doctrine does not apply here because our prior decision involved different parties and different issues. The core issue in *Optional I*, *supra*, 222 Cal.App.4th 1388 was whether "*DAS's conduct* in obtaining money from Alexandria's Credit Suisse account . . . constitute[d] protected activity under section 425.16." (*Optional I*, at p. 1397, italics added.) We were not concerned with Defendants' conduct, because they were not parties to the appeal. In fact, at the time Plaintiff filed its appeal in *Optional I*, Plaintiff had dismissed Akin from the case and had stipulated with Parker that its anti-SLAPP motion could be deferred until after Plaintiff's appeal had been resolved.

In short, Plaintiff is incorrect. The law of the case doctrine is not applicable to this appeal, as the parties and the issues are not the same as those in *Optional I*, *supra*, 222 Cal.App.4th 1388.

## II. The anti-SLAPP statute and applicable legal principles

### A. SECTION 425.16

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson*).)

"In 1992, out of concern over 'a disturbing increase' in these types of lawsuits, the Legislature enacted section 425.16, the anti-SLAPP statute. (§ 425.16, subd. (a).) The statute authorized the filing of a special motion to strike to expedite the early dismissal of these unmeritorious claims. (§ 425.16, subds. (b)(1), (f).) To encourage 'continued participation in matters of public significance' and to ensure 'that this participation should not be chilled through abuse of the judicial process,' the Legislature expressly provided that the anti-SLAPP statute 'shall be construed broadly.' (§ 425.16, subd. (a).)" (*Simpson, supra*, 49 Cal.4th at p. 21.)

The anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) The statute applies to "cause[s] of action

15

against a person *arising from any act of that person in furtherance of the person's right of petition or free speech* under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1), italics added.)  As used in the statutory scheme, an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

    B.    EVALUATING ANTI-SLAPP MOTIONS

In ruling on a motion under section 425.16, the trial court engages in what is now a familiar two-step process. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.]  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the

claim by establishing a probability of success." (*Baral, supra*, 1 Cal.5th at p. 384.)

### 1. *Step one: "arising from" protected activity*

The moving party's burden at step one is to show "the challenged cause of action arises from protected activity." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e).' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

In other words, "it is not enough to establish that the action was filed in response to or in retaliation for a party's exercise of the right to petition. [Citations.] Rather, the claim must be *based on* the protected petitioning activity." (*Bergstein v. Stroock & Stroock & Lavan LLP* (2015) 236 Cal.App.4th 793, 804 (*Bergstein*).) "[I]f the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step." (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266.)

a.     The principal thrust/ gravamen analysis

In determining whether a cause of action is based on protected activity, we "examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies." (*Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510, 519–520.)[4] "We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing *conduct* . . . that provides the foundation for the claim.' " (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272, italics added.)

In determining "whether the challenged claims arise from acts in furtherance of the defendants' right of free speech or right of petition under one of the categories set forth in section 425.16, subdivision (e). . . . '[w]e examine the principal thrust or gravamen of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies.' " (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 209 (*Finton Construction*).)  The "gravamen is defined by the *acts on which liability is based*, not some philosophical thrust or legal essence of the cause of action." (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1190.) In other words, "for anti-SLAPP purposes [the] gravamen [of

---

[4] Gravamen is generally understood to mean "the substantial point or essence of a claim, grievance or complaint."  (Black's Law Dict. (10th ed. 2014) p. 817, col. 1; Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 391 ["the point of a complaint or grievance"].)

18

plaintiff's cause of action] is defined by the *acts on which liability is based.*"  (*Ibid.*, italics added.)

Consequently, "[i]n deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'  (§ 425.16, subd. (b).)" (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 79.) Thus, we are "not limited to examining the allegations of the complaint alone but rather consider the pleadings and the factual material submitted in connection with the special motion to strike."  (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 408 (*Contreras*); see *Karnazes v. Ares* (2016) 244 Cal.App.4th 344, 353 [considering pleadings plus declaration and emails for step one]; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 90 (*Navellier*) [examining "relevant documents" to find acts complained of fall within anti-SLAPP statute].)[5]

---

[5] In the wake of *Baral*, *supra*, 1 Cal.5th 376, one court has rejected the principal thrust or gravamen analysis. (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1170 (*Sheley*).) We are not convinced, however, that *Sheley*'s rejection is well-taken for at least two reasons.

First, *Sheley*'s wholesale rejection of the principal thrust or gravamen analysis is based largely on an extrapolation from *Baral*, *supra*, 1 Cal.5th 376.  (*Sheley*, *supra*, 9 Cal.App.5th 1147.)  In *Baral*, our highest court disapproved a number of cases that used the "primary right theory" to determine whether a cause of action is based on protected activity.  (*Baral*, at pp. 394–395.)  *Baral* explained

19

that the primary rights theory has a " 'fairly narrow field of application. It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits.' " (*Id.* at p. 395.) In addition, "the primary right theory is notoriously uncertain in [its] application." (*Ibid.*) Based on *Baral*'s rejection of the primary rights theory, *Sheley* rejected the principal thrust/gravamen analysis. (*Sheley*, at p. 1170.) *Baral*, however, (as *Sheley* concedes) did not address, let alone disapprove, the principal thrust or gravamen analysis. (See *id.* at p. 1170.)

Second, *Sheley*'s rejection appears to be based, in part, on an overbroad reading of *Baral*, *supra*, 1 Cal.5th 376. (*Sheley*, *supra*, 9 Cal.App.5th 1147.) In *Baral*, our Supreme Court simply held that a special motion to strike can reach distinct claims within pleaded counts, thereby disapproving the so-called *Mann* rule that only entire causes of action can be stricken (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90). (See *Baral*, at p. 396 & fn. 11.) But *Baral* did not say that a special motion to strike must always be limited to challenges within a pleaded count. Rather, *Baral* adopted a permissive approach: "the Legislature's choice of the term 'motion to strike' reflects the understanding that an anti-SLAPP motion, like a conventional motion to strike, *may* be used to attack parts of a count as pleaded." (*Id.* at p. 393, italics added.) In other words, a special motion to strike, like a conventional motion to strike may be used to attack an entire pleading, such as a complaint, and various subparts of a pleading, such as a cause of action or pleaded count, as well as component paragraphs, words or phrases. Critically, in this case, Defendants did not move to strike certain subparts of Plaintiffs' complaint. Instead, they expressly moved to

20

b.    The defendant's burden

A defendant's burden on the first prong is not an onerous one.  A defendant need only make a prima facie showing that plaintiff's claims arise from defendant's constitutionally protected free speech or petition rights.  (See (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.)  " 'The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law.'  [Citation.]  'Instead, under the statutory scheme, *a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis*, and then permit the parties to address the issue in the second step of the analysis, if necessary.  [Citation.]  Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens.' "  (*Id.* at p. 458, italics added.)

2.    *Step two:  probability of prevailing*

"If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."  (*Baral*, *supra*, 1 Cal.5th at p. 384.)  The plaintiff must do so with admissible evidence.  (*Kreeger v. Wanland* (2006) 141 Cal.App.4th 826, 831.)  "We decide this step of the analysis

---

strike Plaintiffs' entire complaint and all claims asserted against them.

21

'on consideration of "the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b).) Looking at those affidavits, "[w]e do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff." ' " (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 378–379, disapproved in part in *Baral*, at p. 396, fn. 11.)

This second step has been described as a " 'summary-judgment-like procedure.' " (*Baral*, *supra*, 1 Cal.5th at p. 384.) A court's second step "inquiry is limited to whether the [opposing party] has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] . . . evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id.* at pp. 384–385.) "Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier*, *supra*, 29 Cal.4th at p. 89.)

C.    STANDARD OF REVIEW

"On appeal, we review the trial court's decision de novo, engaging in the same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step."

(*Tuszynska v. Cunningham*, *supra*, 199 Cal.App.4th at pp. 266–267.)

### III.   The gravamen of Plaintiffs' claims[6] is protected activity

It is well established that the protection of the anti-SLAPP statute extends to lawyers and law firms engaged in litigation-related activity.  As our Supreme Court explained, " 'Any act' " under section 425.16, subdivision (b)(1) "includes communicative conduct such as the filing, funding, and prosecution of a civil action.  [Citation.]  This includes qualifying acts committed by attorneys in representing clients in litigation." (*Rusheen v. Cohen*, *supra*, 37 Cal.4th at p. 1056.)

In fact, courts have adopted "a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908.)  " 'Under the plain language of section 425.16, subdivisions (e)(1) and (2), as well as the case law interpreting those provisions, *all* communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute.' " (*Finton Construction, supra*, 238 Cal.App.4th at p. 210, italics added.)  Cases construing the

---

[6] To avoid confusion, our high court in *Baral*, *supra*, 1 Cal.5th 376 referred to "the proper subject of a special motion to strike as a 'claim' " instead of a " 'cause of action.' " (*Id*. at p. 382.)  Accordingly, we do the same here.

anti-SLAPP statute hold that "a statement is 'in connection with' litigation under section 425.16, subdivision (e)(2), if it relates to the substantive issues in the litigation and is directed to persons having some interest in the litigation." (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266.) Consequently, because settlement negotiations are regarded as an exercise of the right to petition, communications during such negotiations are regarded as having been made in connection with the underlying lawsuit for purposes of section 425.16, subdivision (e)(2). (See *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 963–964.) The protection of the anti-SLAPP statute applies "even against allegations of fraudulent promises made during the settlement process." (*Suarez v. Trigg Laboratories, Inc.* (2016) 3 Cal.App.5th 118, 123.)

As we observed previously, "conduct is not automatically protected merely because it is related to pending litigation; the conduct must arise from the litigation." (*Optional I, supra*, 222 Cal.App.4th at p. 1400.) *Paul v. Friedman* (2002) 95 Cal.App.4th 853 (*Paul*) is illustrative. In that case, a securities broker alleged that an attorney, in litigating a prior arbitration proceeding, conducted an intrusive investigation into the broker's personal life and disclosed details of the broker's life that were not relevant to issues in the arbitration proceedings. (*Id.* at pp. 857–858.) The *Paul* court found that the attorney's conduct was not protected activity within section 425.16 because the communication must occur in

24

connection with an issue under consideration or review in the proceeding. Thus, while the attorney's investigative conduct may have been " 'in connection with' a[] . . . proceeding," it was not "[in] connection with an issue under review in that proceeding," and therefore was not protected activity. (*Id.* at p. 867.)

Here, in contrast to *Paul, supra*, 95 Cal.App.4th 853, Defendants' conduct at issue—as established by Plaintiff's pleading and the factual material submitted by the parties in connection with the anti-SLAPP motions—arose directly out of the litigation in which they were respectively representing DAS. Under Plaintiff's theory of the case, there would not have been any transfer of funds from the Credit Suisse account to DAS but for Akin's work in negotiating a settlement of the state court action and but for Parker's alleged failure to timely disclose the settlement to the federal district court. In fact, Plaintiff even relies on *in-court* statements by Akin lawyers as evidence of a conspiracy with the Kim parties.

In short, the gravamen of Plaintiff's claims against Defendants is based on protected activity, namely Defendants' representation of DAS in litigation (the state court action and the federal forfeiture action).[7] Accordingly,

---

[7] Plaintiff, relying on *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*), argues that while Defendants' motions may apply to its conversion and fraudulent transfer claims, the anti-SLAPP statute does not protect conduct that is illegal; as a result, its third cause of action for violation of

25

we hold that Defendants made a prima facie showing that Plaintiff's claims arise from Defendants' constitutionally protected petition rights.

---

Penal Code section 496 is immune to Defendants' special motions to strike. Plaintiff's reliance on *Flatley* is misplaced. In *Flatley*, the defendant lawyer admitted writing letters and making calls to the plaintiff and his attorneys that, when taken together, threatened to accuse the plaintiff of a variety of crimes and disgrace him in the public media unless he paid a large sum of money. (*Id*. at pp. 306–307, fn. 4, 328–329.) Our Supreme Court held that where "the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law," such activity will not support an anti-SLAPP motion. (*Id*. at p. 320.) However, if "a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step [of the anti-SLAPP analysis] but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Id*. at p. 316.) A long line of cases have concluded in the wake of *Flatley* that its exception for illegal conduct is a "very narrow" one, one that applies "only 'where either the defendant concedes the illegality of its conduct or the illegality is conclusively shown by the evidence.' [Citation.]" (*Finton Construction, supra*, 238 Cal.App.4th at 210.) Here, in contrast to *Flatley*, neither Defendant has conceded that its actions were illegal. Moreover, the evidence presented in connection with the motions does not conclusively establish that Defendants' conduct was illegal as a matter of law. Accordingly, *Flatley* does not put Plaintiff's third cause of action beyond the reach of Defendants' anti-SLAPP motions.

26

## IV. Plaintiff did not show a probability of prevailing on its claims

Defendants contend that Plaintiff cannot show a probability of success because its claims are barred by the litigation privilege of Civil Code section 47, which provides: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding." The litigation privilege is "relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing." (*Flatley*, *supra*, 39 Cal.4th at p. 323.) "A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes a defendant's liability on the claims." (*Bergstein*, *supra*, 236 Cal.App.4th at p. 814.)

### A. THE LITIGATION PRIVILEGE

"The principal purpose of the Civil Code section 47 litigation privilege ' "is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" [Citation.] The privilege promotes effective judicial proceedings by encouraging " 'open channels of communication and the presentation of evidence' " without the external threat of liability. [Citation.] The litigation privilege "further promotes the effectiveness of judicial proceedings by encouraging attorneys to zealously protect their clients' interests." [Citation.] "Finally, in immunizing participants from liability for torts arising from communications made during

27

judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." ' " (*Seltzer v. Barnes, supra,* 182 Cal.App.4th at pp. 969–970.) " ' "Although originally enacted with reference to defamation actions alone [citation], the privilege has been extended to *any communication*, whether or not it is a publication, and to *all torts other than malicious prosecution.* [Citations.] Thus, the privilege has been applied to suits for fraud [citations], negligence and negligent misrepresentation [citation], and interference with contract." ' " (*Id.* at p. 970, italics added.)

The litigation privilege applies "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.) The privilege is "absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241).) " 'Any doubt about whether the privilege applies is resolved in favor of applying it.' " (*Finton Construction, supra,* 238 Cal.App.4th at p. 212.) " 'Many cases have explained that [Civil Code] section 47[, subdivision] (b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit,

28

whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit.' " (*Bergstein*, *supra*, 236 Cal.App.4th at p. 814.)

The scope of the litigation privilege is illustrated by a trio of relatively recent cases:  *Bergstein*, *supra*, 236 Cal.App.4th 793; *Finton Construction*, *supra*, 238 Cal.App.4th 200; and *Contreras*, *supra*, 5 Cal.App.5th 394.

In *Bergstein*, *supra*, 236 Cal.App.4th 793, the plaintiffs sued lawyers who represented their adversaries in litigation over various financial transactions. Plaintiffs asserted that the lawyers engaged in tortious conduct when they " 'solicited and received . . . confidential, privileged, and/or proprietary information' " from one of plaintiffs' former attorneys and "used that information 'in devising the legal strategy to be employed' in the litigation against plaintiffs." (*Id*. at p. 797.)  The attorneys filed a special motion to strike under the anti-SLAPP statute, and the trial court granted the motion, concluding that the complaint arose from protected activity.  (*Id*. at p. 797.)  Plaintiffs appealed, contending that the attorneys were not being sued for written or oral statements made in a judicial proceeding, but rather for the unprotected conduct of aiding and abetting the former attorney's breach of fiduciary duties.  (*Id*. at p. 811.)  The Court of Appeal disagreed and affirmed.  It explained that the anti-SLAPP statute's definitional focus " 'is not the form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability—and whether that activity constitutes protected

29

speech or petitioning.' " (*Id*. at p. 811.)  Thus, the court examines " 'the specific acts of wrongdoing' alleged, 'without particular heed to the form of action within which it has been framed.' " (*Ibid*.)  In *Bergstein*, "[a]lmost all of the 'specific acts of alleged wrongdoing' in the complaint [were] litigation activities." (*Ibid*.)  In fact, the Court of Appeal noted that the plaintiffs did "not identify *any* of defendants' conduct that was *not* a communication made in a judicial proceeding . . . to achieve the objects of the litigation.  Simply claiming that 'aiding and abetting Tregub's breach of fiduciary duty and facilitating Tregub's breach of contract' is 'non-communicative conduct' does not make it so." (*Id*. at p. 815.)

In *Finton Construction*, *supra*, 238 Cal.App.4th 200, a home builder sued a law firm for conversion, alleging that the lawyers had received a stolen hard drive during the course of a lawsuit in which the builder was a defendant.  The trial court granted the lawyers' anti-SLAPP motion and the builder appealed.  (*Id*. at p. 204.)  The Court of Appeal affirmed, holding that the litigation privilege applied to defendants' actions in receiving and retaining the hard drive until it was turned over pursuant to the court's order in the underlying case.  (*Id*. at pp. 212–213.)  In reaching its decision, the Court of Appeal noted that "[w]ithout the litigation privilege, attorneys would simply be unable to do their jobs properly.  No attorney can litigate a trade secret case without examining the disputed materials to determine

30

if they constitute trade secrets or even contain any relevant data at all." (*Id.* at p. 212.)

In *Contreras, supra,* 5 Cal.App.5th 394, the plaintiff, a tenant, accused an attorney, Dowling, of repeatedly aiding and abetting his landlord-clients entering her apartment illegally. In addressing the litigation privilege, the court rejected the tenant's argument that the litigation privilege did not apply because she was suing Dowling for conspiracy and aiding and abetting his clients' illegal entries into the apartment. Citing *Bergstein, supra,* 236 Cal.App.4th 793, the court explained that the sole focus was on Dowling's conduct, not that of his clients. "Simply claiming that Dowling's alleged conspiring or aiding and abetting 'is "non-communicative conduct" does not make it so.' " (*Id.* at p. 416.) The Court of Appeal went on to state that it would not "infer Dowling's concurrence in his clients' acts from the mere existence of their attorney-client relationship," because such an inference would have a "chilling effect on attorneys if their communicative acts can be placed outside the protection of section 425.16 by the unadorned allegation that they conspired in their clients' torts." (*Id.* at p. 418.)

B.   THE LITIGATION PRIVILEGE DEFEATS PLAINTIFF'S CLAIMS

Here, Defendants met their burden of showing that the litigation privilege applies because the communicative conduct at issue—as established by the pleadings and documents submitted in connection with motions—was made in judicial or quasi-judicial proceedings (i.e., the state court

31

action, the federal forfeiture action, and the private mediation in the state court action) by attorneys for DAS to achieve the object of the proceedings and had some connection or logical relation to the action. As with the plaintiffs in *Bergstein*, *supra*, 236 Cal.App.4th 793, Plaintiff failed to identify any nonlitigation-related conduct by either Akin or Parker. Consequently, the litigation privilege applies to bar Plaintiff's claims against Defendants.

Plaintiff argues that, while all of the specific conduct at issue may have occurred in connection with judicial or quasi-judicial proceedings, a jury could infer Defendants' participation in an illegal conspiracy to convert Plaintiff's funds in the Credit Suisse account. For example, Plaintiff places considerable weight on the fact that while Parker learned of the state court settlement in November 2010 it did not disclose the settlement and the resulting transfer to DAS to the federal district court until several month later. According to Plaintiff, "an unbiased fact-finder could reasonably infer from Parker's conduct, relationship, interest and activities that once it learned of the plan [to transfer the funds from the Credit Suisse account to DAS], it not only tacitly consented and acquiesced in it but aided DAS and the Kims in the concealment of the transfer of the funds from Optional."

Plaintiff's argument is unpersuasive. As noted above, the court's analysis under the second step is a " 'summary-judgment-like procedure.' " (*Baral*, *supra*, 1 Cal.5th at p. 384.) Summary judgment may be based on an inference

where it is the only plausible inference that may be drawn from undisputed facts; but "evidence which is equivocal or from which conflicting inferences may be drawn is insufficient." (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 297.) Here, any number of inferences may be drawn from the fact that DAS did not immediately advise the federal district court of the transfer, including the fact that it was, as the district court subsequently concluded, under no legal obligation to do so. We join with the court in *Contreras, supra,* 5 Cal.App.5th at page 418, in expressing grave concern about inferring an attorney-client conspiracy from the mere existence of an attorney-client relationship.

In short, " '[a]n anti-SLAPP motion is an evidentiary motion.' " (*Contreras, supra,* 5 Cal.App.5th at p. 405.) To successfully defend against a special motion under section 425.16, Plaintiff was required to state and substantiate its claims with a prima facie showing of facts. *(Navellier, supra,* 29 Cal.4th at pp. 88–89 & 93.) "The prima facie showing of merit must be made with evidence that is admissible at trial. [Citation.] Unverified allegations in the pleadings or averments made on information and belief cannot make the showing." (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1289.) Plaintiff failed to meet its evidentiary burden. It relied on unverified allegations, averments made on information and belief, and, most critically, on evidence concerning only Defendants' litigation-related

communicative conduct—evidence that was, at best, equivocal—in proving up Plaintiff's claims.[8]

Since the litigation privilege defeats Plaintiff's claims as a matter of law, we affirm the judgment below.[9]

---

[8] The litigation privilege applies not only to Plaintiff's claims for conversion and fraudulent transfer, but also to Plaintiff's third cause of action, violation of Penal Code section 496, because the gravamen of Plaintiff's claim against Defendants is based solely on their communicative conduct in ongoing litigation. (See *Ribas v. Clark* (1985) 38 Cal.3d 355, 364–365; *Kimmel v. Goland* (1990) 51 Cal.3d 202, 210–211; *Rubin v. Green* (1993) 4 Cal.4th 1187, 1193–1194, 1196.) "[C]ommunications made in connection with litigation do not necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal." (*Kashian v. Harriman, supra*, 98 Cal.App.4th at p. 920.) As our Supreme Court has recognized, where a privileged communication by an attorney rises to the level of criminal conduct, "other remedies aside from a derivative suit for compensation will exist," including "criminal prosecution under Business and Professions Code, section 6128[,] and State Bar disciplinary proceedings for violation of Business and Professions Code, section 6068, subdivision (d)." (*Silberg v. Anderson, supra*, 50 Cal.3d at pp. 218–219, fn. omitted.)

[9] In light of our holding with respect to the applicability and effect of the litigation privilege, we decline to address Defendants' other arguments for why Plaintiff could not show a probability of prevailing.

## DISPOSITION

The orders are affirmed.  The parties are to bear their own costs on appeal.


JOHNSON, J.

We concur:


CHANEY, Acting P. J.


LUI, J.

Filed 12/7/17

# CERTIFIED FOR PUBLICATION


# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION ONE


| | |
|---|---|
| OPTIONAL CAPITAL, INC., | B275274 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC474472) |
| v. | CERTIFICATION AND ORDER FOR PUBLICATION |
| AKIN GUMP STRAUSS, HAUER & FELD LLP et al., | |
| Defendants and Respondents. | |


The opinion in the above-entitled matter filed November 16, 2017, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


CHANEY, Acting P. J.        JOHNSON, J.        LUI, J.